John R. Parker, Jr,
California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
Tel: (916) 616-2936
jrparker@almeidalawgroup.com
***Attorneys for Plaintiffs & the Proposed Class***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.D. and A.O.S., *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>CHURCH & DWIGHT CO., INC. d/b/a FIRST RESPONSE,<br><br>*Defendant* | Case No.: 2:24-at-1244<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>1. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1), *et seq.*;<br><br>2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT<br>Cal. Penal Code §§ 630, *et seq.*;<br><br>3. COMMON LAW INVASION OF PRIVACY—INTRUSION UPON SECLUSION;<br><br>4. UNJUST ENRICHMENT |

Plaintiffs A.D. and A.O.S. ("Plaintiffs") bring this class action lawsuit, on behalf of themselves and all others similarly situated, against Church & Dwight Co., Inc. d/b/a First Response ("First Response" or "Defendant). The allegations set forth herein are based on Plaintiffs' personal knowledge, upon due investigation by their counsel and, where indicated, upon information and good faith belief. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## INTRODUCTION

1.    Plaintiffs bring this case to address Defendant's unlawful practice of disclosing Plaintiffs' and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook") and Google, Inc. ("Google"), without consent, through the use of tracking software that is embedded in Defendant's First Response website.

2.    Defendant produces a variety of advanced consumer diagnostic products, under several different brands, including First Response-branded pregnancy testing kits. First Response products include test kits for several sensitive health conditions, including fertility, ovulation and pregnancy status.[1]

3.    In order to market and sell its products, Defendant owns and controls  https://www.firstresponse.com/en/("Defendant's Website" or the

---

[1]  https://www.firstresponse.com/en (last visited Sept. 20, 2024). On information and belief, Defendant sells its First Response products in all 50 states, including California.

"Website"), which it encourages customers to use for reviewing and purchasing pregnancy, fertility and ovulation test kits.

4.      Unbeknownst to customers, Defendant installed third-party tracking technologies such as the Meta Pixel ("Facebook Pixel" or "Pixel"), as well as Google Analytics, DoubleClick and Google Tag Manager (together with the Facebook Pixel, "Tracking Tools"), onto the Website. These Tracking Tools track and collect communications with the Defendant via the Website and surreptitiously force the user's web browser to send those communications to undisclosed third parties, such as Facebook and/or Google.

5.      Plaintiffs and Class Members used the Website to submit information related to their past, present, or future health conditions, including reviewing and purchasing pregnancy, fertility and ovulation test kits. Such Private Information would allow the third party (e.g., Facebook or Google) to know that a specific customer had a specific type of medical condition such as, for example, that they are pregnant and/or are trying to conceive.

6.      Facebook connects user data from Defendant's Website to the individual's Facebook ID (FID). The FID links the user to her/his Facebook profile, which contains detailed information about the profile owner's identity sufficient to identify them personally.

7.      Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private

and non-private) within the same logs and uses these data for serving personalized ads."[2]

8.      Upon information and belief, Google uses DoubleClick cookies such as DSID and IDE that operate similarly to the unique Facebook ID, to track users across websites and target them with ads based on their browsing activities.

9.      Facebook tracks and collects data even on people who do not have a Facebook account or have deactivated their Facebook accounts. Those individuals can find themselves in an even worse situation because even though their Private Information is sent to Facebook—without their consent—they cannot clear past activity or disconnect the collection of future activity since they do not possess an account (or an active account).[3]

10.      Then, completely unencumbered by any pretense of restriction or regulation, Facebook and Google, in turn, use that Private Information for various business purposes, including using such information to "improve" advertisers' ability to target specific demographics and selling such information to third-party marketers who target those Users online (through their Facebook, Instagram, Gmail and other social media and personal accounts):

> Along with encouraging businesses to spend ad dollars, Facebook also receives the transmitted data, and can use it to hone its algorithms. Facebook can also use data from the pixel to link website visitors

---

[2] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).

[3] In the past, these were referenced as "ghost accounts" or "shadow profiles." *See* Laura Hautula, *Shadow profiles: Facebook has information you didn't hand over*, CNET (April 11, 2018), https://www.cnet.com/news/privacy/shadow-profiles-facebook-has-information-you-didnt-hand-over/.

to their Facebook accounts, meaning businesses can reach the exact people who visited their sites. The pixel collects data regardless of whether the visitor has an account.[4]

11.     Simply put, the health information disclosed through tracking technologies is personally identifiable.

12.     In addition to the Tracking Tools, upon information and belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[5]

13.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[6, 7] Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full

---

[4] *See* Colin Lecher & Ross Teixeira, *Facebook Watches Teens Online As They Prep For College*, THE MARKUP (Nov. 22, 2023), https://themarkup.org/pixel-hunt/2023/11/22/facebook-watches-teens-online-as-they-prep-for-college (stating that "[b]usinesses embed the pixel on their own websites voluntarily, to gather enough information on their customers so they can advertise to them later on Meta's social platforms") (last visited Sept. 14, 2024).

[5] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Sept. 20, 2024).

[6] https://revealbot.com/blog/facebook-conversions-api/ (last visited Sept. 20, 2024).

[7] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Sept. 20, 2024).

---

**CLASS ACTION COMPLAINT - 5**

journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[8]

14.   Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

15.   Defendant utilized the Facebook Pixel, Google tracking codes and CAPI data for marketing purposes to bolster their profits. The Tracking Tools and CAPI are routinely used to target specific customers by utilizing data and information from users' communications with the Website to build profiles for the purposes of retargeting and future marketing. Facebook and Google also use Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

16.   Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[9]

---

[8] https://www.facebook.com/business/help/2041148702652965?id=8188590 32317965 (last visited Sept. 20, 2024).

[9] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022),    https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Sept. 19, 2024) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers,

17.    Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

18.    Information that someone is pregnant or is trying to become pregnant is among the most valuable types of data, reported to "worth as much as knowing the age, sex and location of up to 200 individuals since the critical decisions women make during this time (bottles, diapers etc [sic]) can dictate their patters over the next several years."[10]

19.    In secretly deploying the Tracking Tools on its Website to intercept and disclose website communications concerning its customers' PHI and PII, Defendant acted with a tortious and criminal purpose in violation of state and federal laws.

20.    The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA)

---

Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Sept. 19, 2024).

[10] Stephanie Feilinger, Just Media, Inc., *An Interesting Experiment on Big Data Marketing: One Woman's Experience in Trying to Hide her Pregnancy* (July 30, 2014), https://justglobal.com/insights/stefanie-feilinger/an-interesting-experiment-on-big-data-marketing-one-womans-experience-in-trying-to-hide-her-pregnancy/ (last visited Sept. 19, 2024).

Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

21.    In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies like those used by Defendant transmit personally identifying information to third parties, including on the public portion of the website, and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

22.    The Federal Trade Commission (FTC) has also warned healthcare entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[11]

23.    Despite these warnings, Defendant embedded hidden Tracking Tools and, upon information and good faith belief, CAPI on the Website and its servers, essentially planting a bug on customers' web browsers that forced them disclose private and confidential communications to third parties. Defendant did not disclose the presence of these Tracking Tools to their Website users and customers.

24.    Healthcare customers simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party – let alone Facebook and Google, which both have a sordid history of

---

[11] *See Joint Letter*, FEDERAL TRADE COMMISSION, OFFICE FOR CIVIL RIGHTS & DEPARTMENT OF HEALTH AND HUMAN SERVICES (JULY 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Sept. 20, 2024).

privacy violations in pursuit of ever-increasing advertising revenue – without the customers' consent. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

25.     The incontrovertible need for data security and transparency is particularly acute when it comes to the rapidly expanding worlds of telehealth and diagnostic test kits delivered to consumers' homes.

26.     Garnering wide-spread adaptation during the COVID-19 pandemic, these self-collection or at-home testing kits form an important part of consumers' access to healthcare by removing the impediments of having to travel to visit with medical providers – not to mention that these kits allow for quick turnaround at often cheaper price points, in the (supposed) privacy of their own home.

27.     Despite these kits testing for extremely sensitive and personal issues like sexual and reproductive health, many of these at-home test kit retailers appear to value the collection and monetization of user data over all else.[12] And, the universe of data that these companies collect is extremely vast, as at-home test providers (and the laboratories with which they partner) can collect personal and health data on their customers through several channels, including through an initial online symptom survey, purchase information, customer interactions with provider websites or apps, and test results.[13]

---

[12] *See, e.g., Top Mental Health & Prayer Apps Fail Spectacularly at Privacy, Security* (May 2, 2022), https://foundation.mozilla.org/en/blog/top-mental-health-and-prayer-apps-fail-spectacularly-at-privacy-security/ (last visited Sept. 19, 2024).

[13] As noted by the FTC, at-home test kit providers should be upfront with customers about what data they collect, how it is stored and with whom it is shared. *See* fn. 11, *supra*.

28.   Unfortunately, the process of searching for, researching, purchasing and using these kits is not as confidential a process as the manufacturers and retailers of these kits make it seem.

29.   An investigation by The Markup and KFF Health News found that many of the websites by which retailers advertised and sold these kits used certain tracking technologies to collect and to share confidential and protected health information with the biggest social media and advertising platforms, including Facebook and Instagram.[14]

30.   Rather than attempt to collect more and more confidential and protected health information, telehealth and diagnostic test kit companies should minimize data collection and storage to what is necessary to provide health care services. In practice, few do. Rather, likely cognizant that consumers would not voluntarily provide this sensitive and protected information, these companies resort to doing so covertly by installing invisible tracking technologies on their websites to collect and monetize that data.[15]

31.   Moreover, many companies do not publicly disclose what types of data will be shared — for instance, whether a website visitor's contact information or aspects of their health data will be transmitted to third parties. By disclosing customer data to third parties for commercial use and providing little transparency into what data is shared and with whom, test providers

---

[14]   *See* Danielle Ellis, *Need to get Plan B or an HIV test online? Facebook may know about it*, KFF HEALTH NEWS & THE MARKUP (June 30, 2023), https://kffhealthnews.org/news/article/drugstores-pixel-sensitive-data-social-media-companies/ (last visited Sept. 19, 2024).

[15]   *See* fn. 2, *supra*.   Moreover, the policies of many test providers fail to include specific limitations around data retention and deletion, instead relying on vague, catchall language.

1  make it more likely that sensitive data could be leaked, used to discriminate,

2  and/or sold (and re-sold) by data brokers without oversight or consent.[16]

3      32.    Defendant breached its statutory and common law obligations to

4  Plaintiffs and Class Members by, *inter alia*: (i) failing to adequately review

5  its marketing programs to ensure the First Response Website was safe and

6  secure; (ii) failing to remove or disengage technology that was known and

7  designed to share Users' Private Information; (iii) failing to obtain the prior

8  written consent of Plaintiffs and Class Members to disclose their Private

9  Information to Facebook, Google and/or others before doing so; (iv) failing

10  to take steps to block the transmission of Plaintiffs' and Class Members'

11  Private Information through Tracking Tools like the Facebook Pixel, Google

12  Analytics, DoubleClick or CAPI; (v) failing to warn Plaintiffs and Class

13  Members that their Private Information was being shared with third parties

14  without express consent and (vi) otherwise failing to design and monitor the

15  First Response Website to maintain the security, confidentiality and integrity

16  of customer Private Information.

17      33.    As a result of Defendant's conduct, Plaintiffs and Class Members

18  have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack

19  of trust in communicating with health providers online; (iii) emotional

20  distress and heightened concerns related to the release of Private Information

21  to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of

22

_____

23  [16] Kaylana Mueller-Hsia & Laura Hecht-Fellala, *Evaluating the Privacy of At-Home Covid 19 Tests, The Tests Are Essential for Fighting the Pandemic, but Poor Privacy Policy Practices Could Discourage Some People from*

24  *Using Them*, BRENNAN CENTER FOR JUSTICE (Jan. 19, 2021), https://www.brennancenter.org/our-work/analysis-opinion/evaluating-

25  privacy-covid-19-home-tests#:~:text=To%20maximize%20privacy%20protections%2C%20test,how

26  ever%2C%20adhere%20to%20these%20principles (last visited Sept. 19, 2024).

27

28

their Private Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Private Information.

34.     Plaintiffs therefore seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and therefore assert the following statutory and common law claims against Defendant: (i) Violation of Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*, Unauthorized Interception, Use and Disclosure; (ii) Violation of California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; (iii) Invasion of Privacy; and (iv) Unjust Enrichment.

## **PARTIES**

35.     Plaintiff A.D. is, and at all relevant times was, a citizen of the State of California, residing in Mad River, Trinity County, in the State of California.

36.     Plaintiff A.O.S. is, and at all relevant times was, a citizen of the State of California, residing in Lodi, San Joaquin County, in the State of California.

37.     Defendant is incorporated in the State of New Jersey, with its principal place of business at 500 Charles Ewing Boulevard, Ewing, NJ 08628.

## **JURISDICTION AND VENUE**

38.      This Court has subject matter jurisdiction over this civil action pursuant to 28. U.S.C. § 1331. This court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds the sum of $5,000,000 exclusive of interest, fees and costs, there are more than 100 putative Class Members and at least one Class Member is a citizen of a state different from Defendant.

39.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

40.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in the State of California, and because Defendant has falsely advertised and sold its First Response products to consumers in the State of California and in this judicial district.

41.     Personal jurisdiction is also proper because Defendant committed tortious acts in the State of California and this judicial district and Plaintiffs' claims arise out of such acts, and/or because Defendant has otherwise made or established contacts in the State of California and in this judicial district sufficient to permit the exercise of personal jurisdiction.

42.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## COMMON FACTUAL ALLEGATIONS

**A. Federal Regulators Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal**

43.     The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the FTC and the Office for Civil Rights ("OCR") of the Department of Health and Human Services have, in recent months, reiterated the importance of and necessity for data security and privacy concerning health information.

44.     For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys***

*information—or enables an inference—about a consumer's health*. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."**[17]

45.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should **not** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
>
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and Flo make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[18]

---

[17] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[18] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

1

2      46.    The federal government is taking these violations of health data

3  privacy and security seriously, as evidenced by recent high-profile FTC

4  settlements against several telehealth companies.   For example, the FTC

5  imposed a $1.5 million penalty on GoodRx last year for violating the FTC

6  Act by sharing its customers' sensitive PHI with advertising companies and

7  platforms, including Facebook, Google and Criteo, and reached a $7.8 million

8  settlement   with   the   online   counseling   service   BetterHelp,   resolving

9  allegations that the company shared customer health data with Facebook and

10  Snapchat for advertising purposes. Similarly, Easy Healthcare was ordered to

11  pay a $100,000 civil penalty for violating the Health Breach Notification Rule

12  when its ovulation tracking app, Premon, shared health data for advertising

13  purposes.[19]

14      47.    In July 2023, federal regulators sent a letter to approximately 130

15  healthcare providers warning them about the risk of online tracking

16  technologies resulting in the unauthorized disclosure of Private Information

17  to third parties. The letter highlighted the "risks and concerns about the use

18

19  _____
[19] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*,
20  Health    IT    Security,    https://healthitsecurity.com/features/how-ftc-
enforcement-actions-will-impact-telehealth-data-privacy (last visited Sept.
21  14, 2024); *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under
Health    Breach    Rule*,    Law360    (Feb.    1,    2023),
22  www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-
health-breach-rule?copied=1 ("The Federal Trade Commission signaled it
23  won't hesitate to wield its full range of enforcement powers when it dinged
GoodRx for allegedly sharing sensitive health data with advertisers, teeing up
24  a big year for the agency and boosting efforts to regulate data privacy on a
larger       scale.");       https://www.ftc.gov/news-events/news/press-
25  releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-
sensitive-health-data-advertising;       https://www.ftc.gov/news-
26  events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-
be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited
27  Sept. 14, 2024).

28

of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[20]

48.    Moreover, the Department of Health and Human Service's Office for Civil Rights ("OCR") has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "OCR Bulletin"), that the transmission of such protected information violates HIPAA's Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[21]

---

[20] *See* OCR, *Use of Online Tracking Technologies* (July 20, 2023), https://www.hhs.gov/sites/default/files/use-online-tracking-technologies.pdf (last visited Sept. 20, 2024).

[21] *See* HHS, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.").

This guidance was recently vacated *in part* by the Federal District Court for the Northern District of Texas due to the court finding it in part to be the

49.     The OCR Bulletin discusses the harms that disclosure may cause persons:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[22]

50.     Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health

---

product of improper rulemaking and it is cited for reference only until the OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024). Notably, the court's order found only that the OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines the OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients were making appointments for particular conditions, paying medical bills or logging into (or using) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating the OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions against healthcare providers for committing the same actions alleged herein).

[22] *Id* (emphasis added).

care providers' and telehealth companies' digital properties to monetize their Users' Private Information.

51.     For instance, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation of 50 direct-to-consumer telehealth companies performed by Stat and The Markup reported that telehealth companies or virtual care websites were providing sensitive medical information to the world's largest advertising platforms.[23]

52.     This report also found that many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn and/or Pinterest—that collected patients' answers to medical intake questions.[24]

**B. Underlying Web Technology**

53.     To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

54.     Devices (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

55.     Every website is hosted by a computer "server" that holds the website's contents, and through which the entity in charge of the website

---

[23]   Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools*, The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[24] *See id* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

exchanges communications with an internet users' client devices via their web browsers.

56.    Web communications consist of HTTP or HTTPS Requests, and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.
- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.
- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.
- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[25]

_____

[25] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

57.    A user's HTTP Request asks the Defendant's Website to retrieve certain information (such as "Find a Doctor" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the user's screen as they navigate Defendant's Website.

58.    Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

59.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's implementation of the Tracking Tools is source code that does just that. The Tracking Tools act much like a traditional wiretap. When users and/or customers visit Defendant's Website via an HTTP Request to First Response server, the server sends an HTTP Response including the Markup that displays the webpage visible to the user and Source Code including the Tracking Tools. Thus, Defendant are in essence handing users a tapped phone, and once the webpage is loaded into the user's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties, including Facebook and Google.

60.    Third parties, like Facebook and Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication

to ensure the third-party can uniquely identify the customer associated with the Private Information intercepted.

61.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that savvy users cannot evade.   Facebook's workaround, for example, is CAPI. CAPI is an effective workaround because it transmits information from Defendant's own servers, and does not rely on the user's web browser. CAPI "is designed to create a direct connection between [Website hosts'] marketing data and [Facebook]." Thus, the communications between customers and Defendant, which are necessary to use Defendant's Website, are received by Defendant and stored on its server before CAPI collects and sends the Private Information contained in those communications directly from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

62.     While there is no way to confirm with certainty that a Website host like First Response has implemented workarounds like CAPI without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[26] Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

---

[26]https://www.facebook.com/business/help/308855623839366?id=81885903 2317965 (last visited Sept. 20, 2024).

63.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive Website content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (i.e., to bolster profits).

64.     Thus, without any knowledge, authorization, or action by a user, a website owner like First Response can use its source code to commandeer the user's computing device, causing it to contemporaneously and invisibly re-direct the user's communications to third parties.

65.     In this case, Defendant employed the Tracking Tools (and CAPI) to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook and Google.

66.     By contrast, the Markup is the façade of the Website and what the user sees.

67.     As an example, a customer's HTTP Request seeks specific information from the Defendant's Website (e.g., "Pregnancy Tests" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

68.     Therefore, when a customer visits https://www.firstresponse.com/en/product-listings and selects the "Pregnancy Tests" tab, the customer's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that webpage. The user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses:

*Figure 1. Screenshot taken from the user's web browser using Google Developer Tools upon visiting https://www.firstresponse.com/en/product-listings#pregnancy*

69. The image above displays the Markup of Defendant's Webpage (on the left side). Behind the scenes and in the backdoor of the webpage, tracking technologies like the Facebook Pixel and the Google Analytics tracking tools are embedded in the Source Code (*see, e.g.*, Pixel transmissions on the right side of the Figure 1), automatically transmitting what the customer does on the webpage, and effectively opening a hidden spying window into the customer's browser.[27]

**C. Tracking Tools**

70. Third parties such as Facebook and Google offer Tracking Tools as free software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are

---

[27] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. For example, the Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

used to gather, identify, target, and market products and services to individuals.

71.    In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

72.    When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Facebook Pixel on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Facebook's server.

73.    Google Analytics tracking tool is marginally different than the Facebook Pixel, but essentially accomplishes the same goal: tracking what a user communicates to Defendant's website.[28]

74.    Notably, transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiffs' and Class Member's Private Information would not have been disclosed to Facebook or Google via this technology but for Defendant's decisions to install the Tracking Tools on the First Response Website.

75.    Sometimes a particularly tech-savvy user attempts to circumvent browser-based wiretap technology, so a website operator can also transmit data directly to Facebook using first-party cookies (CAPI server-to-server

---

[28] *Comparing Google Analytics vs Facebook Pixel*, BOLTIC, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited Sept. 20, 2024).

transmission). Users cannot detect or prevent transmissions through first-party cookies.

76.    CAPI is another Facebook tool that functions as a redundant measure to circumvent any ad blockers or other denials of consent by the website user by transmitting information directly from Defendant's servers to Facebook's servers.[29, 30] Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[31]

77.    The third parties to whom a website transmits data through Tracking Tools and associated workarounds (CAPI) do not provide any substantive Website content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

78.    Thus, without any knowledge, authorization, or action by a user, website owners like Defendant can use their source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

---

[29]*What is the Facebook Conversions API and how to use it*, Realbot (last updated May 20, 2022), https://revealbot.com/blog/facebook-conversions-api/ (last visited Sept. 20, 2024).

[30] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels."    *See*    https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Sept. 20, 2024).

[31]*About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Sept. 20, 2024).

**D. Defendant Disclosed Plaintiffs' and Class Members' Private Information to Facebook and Google Using Tracking Tools**

79.     In this case, Defendant employed Tracking Tools, including the Facebook Pixel and Conversions API, as well as the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook and Google.

80.     Defendant's Source Code manipulates the user's browser by secretly instructing it to duplicate the user's communications (HTTP Requests) with Defendant and to send those communications to Facebook and Google. These transmissions occur contemporaneously, invisibly, and without the user's knowledge.

81.     Thus, without its customers' consent, Defendant have effectively used their source code to commandeer and "bug" or "tap" its customers' computing devices, allowing Facebook, Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

82.     The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

83.     While seeking and using Defendant's services and products, Plaintiffs and Class Members communicated their Private Information to Defendant via the First Response Website.

84.     Plaintiffs and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

85.     Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private

Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

86.  Defendant's Tracking Tools sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiffs' and Class Members': (1) sensitive health conditions; (2) desired medical services or products; (3) details of their activities on a specific First Response product's page and (4) the fact that they were proceeding to purchase a particular First Response product, including the specific retailer they chose.

87.  Importantly, the Private Information Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific user. Information sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual customers' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[32]

88.  A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can

---

[32] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers that can be easily used to look up that person's Facebook account by simply typing the numbers after www.facebook.com/ and hitting "Enter."

easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

89.     Similar to Facebook, the Private Information Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific customer. Information sent to Google was sent alongside the Plaintiffs' and Class Members' unique identifier (such as "DSID" and/or "IDE" cookies from DoubleClick), thereby allowing individual customers' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[33]

90.     Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

91.     Defendant deprived Plaintiffs and Class Members of their privacy rights when they: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online customers' confidential communications and Private Information; (2) disclosed customers' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

92.     By installing and implementing both Facebook tools and Google Analytics, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Facebook and Google and for those communications to be personally identifiable.

---

[33] *See Brown v. Google LLC*, 2023 WL 5029899, at fn. 2, *supra*, note 3 (quoting Google employee deposition testimony explaining how Google tracks user data).

93.    As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E. Defendant's Tracking Tools Disseminate Customer Information Via the First Response Website**

94.    An example illustrates the point. If a customer uses the Website to find a First Response product, Defendant's Website directs them to communicate Private Information, including the particular type of testing kit the customer is seeking (pregnancy, ovulation, fertility, and/or menopause). Unbeknownst to the user, each and every communication is sent to third parties, namely Facebook and Google, via Defendant's Tracking Tools, including the type of test kit the customer is interested in purchasing and whether they proceed to click the "Buy now" button for each specific First Response product.

95.    In the example below, the user navigated to the "Pregnancy Tests" page in Defendant's Website and chose the "Rapid Result Pregnancy Test":



*Figures 2-3. Screenshots taken from the user's web browser using Google Developer Tools upon visiting https://www.firstresponse.com/en/product-listings/rapid-result-pregnancy-test*

96.     Unbeknownst to ordinary users, this webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Tracking Tools. The right side of the image shows the "behind the scenes" portion of the website that is invisible to ordinary users. Importantly, each entry in the column represents just one instance in which Defendant's Tracking Tools sent this user's information to Facebook.

97.     The first line of Source code text, "id: 245917457166768" refers to Defendant's Pixel ID and confirms that Defendant has downloaded the Facebook Pixel into their Source Code for this webpage.

98.   The second line of text, "ev: PageView," identifies and categorizes which actions the user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as viewing the page with instructions on how to use the First Response Rapid Result Pregnancy Test.

99.   The additional lines of highlighted text show Defendant have disclosed to Facebook that the user is interested in a particular product for detecting pregnancy.

100.   Finally, the last line of Source code text in the image above and the second line of text in the image below ("GET") demonstrate that Defendant's Pixel sent the user's communications, and the Private Information contained therein. As described herein and demonstrated below, this data is sent alongside the user's Facebook ID (c_user ID) and other unique personal identifiers, thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.

101.   To make matters worse, Defendant's Facebook Pixel also shared its' customers purchasing activities with Facebook.

102.   The Website offers customers an option to buy First Response products online:





*Figures 4-5. Screenshots taken from the user's web browser using Google Developer Tools depicting purchasing options on https://www.firstresponse.com/en/product-listings/rapid-result-pregnancy-test webpage*

103.   If, following the examples above, the user clicked on the "Buy Online" button on the product's webpage, Defendant transmitted that information to Facebook as well, along with the customer's unique personal identifiers.

104.   Defendant further disclosed the online retailer from which the customer purchased a First Response product, via a 'SubscribedButtonClick' event that Defendant configured its Meta Pixel to capture and send to Facebook:

*Figure 6. Screenshot of the details of the user's purchasing activity on the First Response Webpage for the Rapid Result Pregnancy Test disclosing that the consumer proceeded to purchase the test online at Walmart, along with the user's unique Facebook id contained in the c_user field under "Cookie" and other unique personal identifiers.*[34]

105.   In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to

---

[34] The user's Facebook ID is represented as the c_user ID highlight in the image below, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.

link the user's online communications and interactions to their individual Facebook profile.

106. Facebook receives at least six cookies when Defendant's Website transmits information via the Pixel, including the c_user, datr, fr and _fbp cookies.[35]

107. The "datr" cookie contains a unique alphanumeric code and identifies the specific web browser from which the user is sending the communication. It is an identifier that is unique to the user's web browser and is therefore a means of identification for Meta. Meta keeps a record of every datr cookie identifier associated with each of its users.

108. The fr cookie, a unique combination of the c_user and datr cookies, contains an encrypted Facebook ID and browser identifier.[36] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[37]

109. The datr and fr cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant are ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout the First Response Website.

---

[35] *See supra,* Figures 2-3 and 6.

[36] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited Sept. 20, 2024).

[37] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited Sept. 20, 2024).

---

110. Defendant also revealed the Website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user, *Figure 7*:[38]

fbp: fb.1.1721187452256.365235035845085745

111. The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Meta Pixel program. The fbp cookie emanates from Defendant's Website as a putative first party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. Therefore, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies.

112. Google Analytics also uses "first-party" cookies like _ga and _gid (unique to each specific website) to track users' activities on non-Google websites.

113. The __ga and _gid cookies communicate similar information to Google similarly to the way that Facebook's _fbp cookie operates.

114. The Facebook Pixel uses both first- and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, customers' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

115. Upon information and belief, Google cross-references third-party cookie data, browser fingerprints and other demographic details to

---

[38] *Id.*

match up all the individual first-party cookies to a single person for tracking purposes.

116. At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant has been using additional Tracking Tools to transmit its users' Private Information to additional third parties. For example, Plaintiffs' counsels' investigation revealed that Defendant was also sending its customers' protected health information to Google via Google tracking tools including Google Analytics and Google Tag Manager.

117. Google Tracking Tools installed on the First Response Website appear to collect the same types and categories of sensitive Private Information from Defendant's customers as the Facebook Pixel and, in some instances, even more data.



```
dl: https://www.firstresponse.com/en/product-listings/test-and-confirm-pregnancy-test
dt: Test and Confirm Pregnancy Test | First Response™
en: pdp_tab_clicks
_c: 1
ep.pdp_tab_name: how to use
```

*Figures 8-9. Screenshots taken from the user's web browser using Google Developer Tools demonstrating data captured by Google tracking codes when a user clicks the 'How To Use' button on https://www.firstresponse.com /en/product-listings/test-and-confirm-pregnancy-test#HowToUse webpage*

118.   Similarly to the Meta Pixel, Google Analytics shares the name of the First Response testing product a customer is reviewing, whether they are looking up instructions on its use, and the fact that they are attempting to purchase the product in question:

```
dl: https://www.firstresponse.com/en/product-listings/test-and-confirm-pregnancy-test
dt: Test and Confirm Pregnancy Test | First Response™
en: buy_online_PDP
_c: 1
ep.pdp: button: buy online-test and confirm pregnancy test
```

*Figure 10. Screenshots taken from the user's web browser using Google Developer Tools demonstrating data captured by Google tracking codes when a user clicks the 'Buy Online' button on https://www.firstresponse.com/en/product-listings/test-and-confirm-pregnancy-test#HowToUse webpage*

119.   As described *supra*, this information is shared with Google along with the DSID, IDE, __ga and _gid cookies that Google uses to identify unique users, build their profiles and use that data for targeted advertising.

120.   Defendant does not disclose that the Pixel, Google trackers, first-party cookies from third parties like Facebook and/or Google, or any other Tracking Tools embedded in the Website's source code track, record, and transmit Plaintiffs' and Class Members' Private Information to Facebook and Google for targeted advertising. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Facebook or Google for marketing.

1

2        **F. Facebook's Platform & its Business Tools**

3        121.  Facebook operates the world's largest social media company and

4   generated $117 billion in revenue in 2021, roughly 97% of which was derived

5   from selling advertising space.[39]

6        122.  In  conjunction  with  its  advertising  business,  Facebook

7   encourages and promotes entities and website owners, such as Defendant, to

8   utilize its "Business Tools" to gather, identify, target and market products and

9   services to individuals.

10       123.  Facebook's Business Tools, including the Pixels, are bits of code

11  that advertisers can integrate into their webpages, mobile applications, and

12  servers, thereby enabling the interception and collection of user activity on

13  those platforms.

14       124.  The  Business  Tools  are  automatically  configured  to  capture

15  "Standard  Events"  such  as  when  a  user  visits  a  particular  webpage,  that

16  webpage's Universal Resource Locator ("URL"), metadata, button clicks, and

17  other user interactions with a webpage.[40]

18

19

20

---

21  [39] INVESTOR.FB.COM, *META REPORTS FOURTH QUARTER AND FULL YEAR 2021
    RESULTS*,                  https://investor.fb.com/investor-news/press-release-
22  details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-
    Results/default.aspx (last visited Sept. 19, 2024).

23  [40]*Specifications    for    Facebook    Pixel    Standard    Events*,
    https://www.facebook.com/business/help/402791146561655?id=120537668
24  2832142 (last visited Sept. 19, 2024); *see* META PIXEL, GUIDES, ADVANCED,
    https://developers.facebook.com/docs/meta-pixel/advanced (last visited Sept.
25  19,   2024);   *see   also*   BEST   PRACTICES   FOR   META   PIXEL   SETUP,
    https://www.facebook.com/business/help/218844828315224?id=120537668
26  2832142 (last visited Sept. 19, 2024); META MARKETING API, APP EVENTS
    API,      https://developers.facebook.com/docs/marketing-api/app-event-api/
27  (last visited Sept. 19, 2024).

28

---

125.   Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[41]

126.   One such Business Tool is the tracking Meta Pixel which "tracks the people and type of actions they take."[42]

127.   When a user accesses a webpage that is hosting the Pixels, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers—traveling directly from the user's browser to Facebook's server.

128.   This second, contemporaneous, and secret transmission contains the original GET request sent to the host website, along with additional data that the Pixels are configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

129.   Accordingly, during the same transmissions, the Website routinely provides Facebook with its customers' Facebook IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, treatment requests, and the webpages they view, but also their name, email address, and phone number.

---

[41] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=120537668 2832142; *see also* META MARKETING API, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Sept. 19, 2024).

[42] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Sept. 19, 2024).

130.   This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of customers.[43] Plaintiffs' and Class Members' identities can be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

131.   After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, the information collected via the Facebook pixel is associated with the user's Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity.

132.   A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.   To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

133.   This disclosed PHI and PII allows Facebook to know that a specific customer is seeking confidential medical care and the type of medical care being sought (in the case of Defendant, purchasing sensitive healthcare

---

[43] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Sept. 19, 2024).

products including pregnancy, fertility, and menopause testing kits to diagnose and/or treat highly sensitive and private conditions), and Facebook then sells that information to marketers who will online target Plaintiffs and Class Members.

134.  In fact, in an action pending against Facebook related to use of its Meta Pixel on a healthcare provider's website, Facebook explicitly stated it requires Pixel users to "post a prominent notice on every page where the pixel is embedded and to link from that notice to information about exactly how the pixel works and what is being collected through it, so it is not invisible."[44]

135.  By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendant breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Private Information.

## G. Defendant's Conduct Is Unlawful and Violated Industry Norms

### i. Defendant Violated California Law

136.  California law has established policies and procedures for the protection of the privacy of confidential communications.

137.  California law provides that, "[a]ny person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at

---

[44] *See* Transcript of the Argument on Plaintiff's Motion for Preliminary Injunction, *In re Meta Pixel Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022).

1  any place within this state; or who uses, or attempts to use, in any manner, or

2  for any purpose, or to communicate in any way, any information so obtained,

3  or who aids, agrees with, employs, or conspires with any person or persons to

4  unlawfully do, or permit, or cause to be done any of the acts or things

5  mentioned above in this section, is punishable by a fine not exceeding two

6  thousand five hundred dollars)." Cal. Penal Code § 631(a).

7      138.  Section 631(a) is not limited to phone lines, but also applies to

8  "new technologies" such as computers, the Internet, and email. *See Matera v.*

9  *Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA

10  applies to "new technologies" and must be construed broadly to effectuate its

11  remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL

12  3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic

13  communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956

14  F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law

15  privacy claims based on Facebook's collection of consumers' Internet

16  browsing history).

17      139.  Defendant's actions described herein violated California law

18  because Defendant aided, employed, agreed with, and conspired with

19  Facebook, Google and likely other third parties to track and intercept

20  Defendant's customers' internet communications via the Tracking Tools

21  while their customers use the Website.

22          ***ii. Defendant Also Violated HIPAA Standards of Care***

23      140.  Under federal law, a healthcare provider may not disclose

24  personally identifiable, non-public medical information about a patient, a

25

26

27

28

potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[45]

141.  Defendant, although not a covered entity under HIPAA, engaged in actions that are in violation of HIPAA's rules and standards in place to protect individuals' PHI.

142.  The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[46]

143.  The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

144.  IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b)

---

[45]  HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[46]  HIPAA For Professionals, https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html (last visited Sept. 18, 2024).

"[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

145.   Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> a.  Names;
> ***
> H. Medical record numbers;
> ***
> J.  Account numbers;
> ***
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> ***
> R. Any other unique identifying number, characteristic, or code…; and
> S. the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

146.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

147.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1)

uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

148.   In its advisory document, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the OCR instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[47]

149.   In its guidance document entitled *Marketing*, the OCR further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list* (emphasis added).[48]

---

[47]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Sept. 18, 2024).

[48] *Id.*

150.   As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[49]

151.   The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

152.   Defendant's use of third-party Tracking Tools on its Website to capture and disclose users' PHI to Facebook and Google violates HIPAA's rules and industry standards.

**H. Users' Reasonable Expectation of Privacy.**

153.   Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought sensitive healthcare products from Defendant.

154.   Indeed, at all times when Plaintiffs and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to health care.

155.   Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares that individual's data to be one of the most important privacy rights.

156.   For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required

---

[49] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Sept. 18, 2024).

to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[50]

157.   The privacy of their personal data and the expectation that their Personal Information would not be shared without consent were material factors leading to Plaintiffs' and Class Members' purchases of Defendant's medical products, including fertility tests, ovulation tests, and pregnancy tests.

**I.   Defendant was Enriched and Benefitted from the Use of Pixels, Google trackers and Unauthorized Disclosures.**

158.   The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of customer data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

159.   Defendant used the Tracking Tools on the Website for its own purposes of marketing and increasing profits.

160.   Based   on   information   and   belief,   Defendant   receives compensation from third parties like Facebook and Google in the form of

---

[50] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/   (last visited Sept. 19, 2024).

enhanced advertising services and more cost-efficient marketing on third-party platforms in exchange for disclosing customers' personally identifiable information.

161.   Based on information and belief, Defendant was advertising its services on Facebook, as well as other online platforms, and the Pixels were used to "help [First Response] understand which types of ads and platforms are getting the most engagement[.]"[51]

162.   Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

163.   Upon information and belief, Defendant re-targeted customers and potential customers to get more people to use its services and purchase their products. These customers include Plaintiffs and Class Members.

164.   By utilizing the Pixel and , Google trackers Defendant's cost of advertising and retargeting was reduced, thereby benefiting and enriching Defendant.

**J.  Plaintiffs' and Class Members' Data has Financial Value**

165.   Plaintiffs' and Class Members' Private Information had value and Defendant's interception and unauthorized disclosure thereof harmed Plaintiffs and the Class.

166.   Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure will only increase; estimates for 2022 are as high as $434 per user, for a total of more than $200-billion industry-wide.

167.   The value of health data particularly is well-known and has been reported on extensively in the media. For example, Time Magazine published

---

[51] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Sept. 14, 2024).

an article in 2017 titled *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry* describing the extensive market for health data that observed that the market for information was both lucrative and a significant risk to privacy.[52]

168.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[53]

169.   Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

170.   Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

171.   Technology companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

---

[52] *See* https://time.com/4588104/medical-data-industry/ (last visited Sept. 19, 2024).

[53]*See*   https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Sept. 19, 2024).

172.   Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[54]

173.   The Private Information at issue here is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes, including identity theft and medical and financial fraud.[55] A robust "cyber black market" exists where criminals openly post stolen PII and PHI on underground Internet websites, commonly referred to as the dark web.

174.   While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[56]

175.   PHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

176.   PHI can also be used to create fraudulent insurance claims and facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

177.   Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is comingled with other records, it can lead to misdiagnoses or mistreatment.

---

[54] *Id.*

[55]   FTC, *Warning Signs of Identity Theft,* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Sept. 19, 2024).

[56]   Center for Internet Security, *Data Breaches: In the Healthcare Sector,* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Sept. 19, 2024).

178.   The FBI Cyber Division issued a Private Industry Notification on April 8, 2014 that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[57]

179.   Cybercriminals often trade stolen Private Information on the black market for years following a breach or disclosure. Stolen Private Information may also be posted on the Internet, making it publicly available.

180.   Defendant gave away Plaintiffs' and Class Members' communications and transactions on the Website without permission.

181.   The unauthorized access to Plaintiffs' and Class Members' Private Information has diminished the value of that information, resulting in harm to Users, including Plaintiffs and Class Members.

## K. Defendant Used and Disclosed Plaintiffs' and Class Members' Private Information Without Their Knowledge, Consent, Authorization, or Further Action

182.   The Tracking Tools incorporated into, embedded in, or otherwise permitted on Defendant's Website were invisible to Plaintiffs and Class Members while using that Website. The Tracking Tools on Defendant's Website were seamlessly integrated into the Website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

---

[57] *Private Industry Notification: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FEDERAL BUREAU OF INVESTIGATION – CYBER DIVISION, *available online at*: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last visited Sept. 20, 2024).

183.  Plaintiffs and Class Members were shown no disclaimer or warning that their Private Information would be disclosed to any unauthorized third party without their express consent.

184.  Plaintiffs and Class Members had no idea that their Private Information was being collected and transmitted to an unauthorized third party.

185.  Because Plaintiffs and Class Members had no idea of the presence of the Tracking Tools on Defendant's website, or that their Private Information would be collected and transmitted to Meta and/or Google for advertising, they could not and did not consent to Defendant's conduct.

186.  Plaintiffs and Class Members did not give consent or authorization for Defendant to disclose their Private Information to Meta or to any third party for marketing purposes.

**L. Representative Plaintiffs Experiences**

***Plaintiff A.D.***

187.  Plaintiff A.D. has utilized Defendant's Website on several occasions to look up, research, and purchase First Response pregnancy test kits.

188.  Plaintiff A.D. accessed Defendant's Website on her computer and mobile device and, as a condition of purchasing Defendant's products, Plaintiff disclosed her Private Information to Defendant.

189.  Specifically, Plaintiff A.D. used the First Response Website on numerus occasions starting in or around September 2021 to look up First Response products and to purchase First Response Triple Check Pregnancy Test kits online by clicking the "Buy Now" button on the Website.

190.  Plaintiff A.D. has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged

into, and which is registered under her legal name on the same devices she used to access the First Response Website.

191.   Plaintiff A.D. has maintained an active and valid Google account throughout the relevant period in this case.

192.   The full scope of Defendant's interceptions and disclosures of Plaintiff A.D.'s communications to Meta and Google can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's present or future medical condition. The following long-URLs or substantially similar URLs were sent to Meta via the Pixel and to Google via Google Analytics:

https://www.firstresponse.com/en/product-listings
https://www.firstresponse.com/en/product-listings/triple-check-pregnancy-test-kit

193.   Contemporaneously with the interception and transmission of Plaintiff A.D.'s communications on https://www.firstresponse.com/en, Defendant also disclosed to Meta Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

194.   Plaintiff A.D. reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

195.   Plaintiff A.D. provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

196.   Further to the systematic process described herein, Defendant assisted Facebook and Google with intercepting Plaintiff A.D.'s communications, including those that contained personally identifiable

information, protected health information and related confidential information.

197. Defendant assisted these interceptions without Plaintiff A.D.'s knowledge, consent or express written authorization.

198. After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

199. Following her visits to Defendant's Website in or around September of 2021 to review and purchase First Response pregnancy test kits, Plaintiff A.D. observed advertisements on her Facebook account related to the products she sought and received through webpages she viewed and accessed on Defendant's Website, specifically ads for various pregnancy test kits.

200. Defendant breached Plaintiff A.D.'s right to privacy and unlawfully disclosed her Private Information to Facebook.

201. Plaintiff A.D. would not have used Defendant's Website to review and purchase First Response pregnancy tests had she known that the

Website is tracking and disclosing her PHI to third-party data brokers like Facebook and Google.

202.   Plaintiff A.D. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

***Plaintiff A.O.S.***

203.   Plaintiff A.O.S. has utilized Defendant's Website look up, research, and purchase First Response pregnancy test kits.

204.   Plaintiff A.O.S. accessed Defendant's Website on her computer and mobile device and, as a condition of purchasing Defendant's products, Plaintiff disclosed her Private Information to Defendant.

205.   Specifically, Plaintiff A.O.S. used the First Response Website in July 2024 to look up and research First Response products and to purchase a First Response Triple Check Pregnancy Test kit online by clicking the "Buy Now" button on the Website and clicking the "Check Out on Amazon" button on the Website.

206.   Plaintiff A.O.S. has maintained an active Facebook account throughout the relevant period in this case, which she is perpetually logged into and which is registered under her legal name on the same devices she used to access the First Response Website.

207.   Plaintiff A.O.S. has maintained an active and valid Google account throughout the relevant period in this case.

208.   The full scope of Defendant's interceptions and disclosures of Plaintiff A.O.S.'s communications to Meta and Google can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's present or future medical

condition. The following long-URLs or substantially similar URLs were sent to Meta via the Pixel and to Google via Google Analytics:

https://www.firstresponse.com/en/product-listings
https://www.firstresponse.com/en/product-listings/triple-check-pregnancy-test-kit

209.   Contemporaneously with the interception and transmission of Plaintiff A.O.S.'s communications on https://www.firstresponse.com/en, Defendant also disclosed to Meta Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

210.   Plaintiff A.O.S. reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

211.   Plaintiff A.O.S. provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

212.   Further to the systematic process described herein, Defendant assisted Facebook and Google with intercepting Plaintiff A.O.S.'s communications, including those that contained personally identifiable information, protected health information and related confidential information.

213.   Defendant assisted these interceptions without Plaintiff A.O.S.'s knowledge, consent or express written authorization.

214.   After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-

world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

215.   Following her visits to Defendant's Website in or around July 13, 2024 to review and purchase a First Response pregnancy test kit, Plaintiff A.O.S. observed advertisements on her Facebook account related to the products she sought and received through webpages she viewed and accessed on Defendant's Website, specifically advertisements for various pregnancy test kits from First Response and other companies, as well as advertisements for various fertility and conception-related products such as pills and gels.

216.   Defendant breached Plaintiff A.O.S.'s right to privacy and unlawfully disclosed her Private Information to Facebook.

217.   Plaintiff A.O.S. would not have used Defendant's Website to review and purchase First Response pregnancy tests had she known that the Website is tracking and disclosing her PHI to third-party data brokers like Facebook and Google.

218.   Plaintiff A.O.S. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## TOLLING, CONCEALMENT & ESTOPPEL

219.   Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of their incorporation of the Meta Pixel and/or Google Analytics into its First Response Website.

220.    The Meta Pixel and other tracking tools on Defendant's Website were and are entirely invisible to a Website visitor.

221.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

222.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

223.    Defendant had exclusive knowledge that its Website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to its customers, including Plaintiffs and Class Members, that by purchasing sensitive healthcare products including fertility, ovulation, and pregnancy test kits through Defendant's Website, Plaintiffs' and Class Members' Private Information would be disclosed or released to Meta and other unauthorized third parties.

224.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Private Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

225.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

226.    The earliest that Plaintiffs, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint when they discussed Defendant's violations with their counsel in August of 2024.

## **CLASS ALLEGATIONS**

227.   This action is brought by the named Plaintiffs behalf of both themselves, and a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

228.   The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All natural persons who used Defendant's Website to purchase healthcare products to treat and/or diagnose sensitive health conditions and whose Private Information was disclosed or transmitted to Facebook, Google or any unauthorized third party.

229.   In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of the California Subclass, which is defined as follows:

> All natural persons residing in California who used Defendant's Website to purchase healthcare products to treat and/or diagnose sensitive health conditions and whose Private Information was disclosed or transmitted to Facebook, Google or any unauthorized third party.

230.   Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

231.   Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

232.   **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Upon information and good faith belief, there are at least one-million customers that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

233. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting individual Class Members. These common questions include, but are not limited, to the following:

    a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

    b.  Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

    c.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

    d.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information was being disclosed without their consent;

    e.  Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of customers' Private Information;

    f.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

    g.  Whether Defendant violated the statutes asserted as claims in this Complaint;

    h.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct and

     i.   Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

234. **Typicality**: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

235. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

236. **Predominance**: Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Pixel Information Recipients, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

237. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple

individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

238.   Defendant has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

239.   Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

    b.  Whether Defendant breached a legal duty to Plaintiffs and the Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

240. Finally, all members of the proposed Class are readily ascertainable. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## COUNT I
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(1), *et seq.*
### Unauthorized Interception, Use, and Disclosure
### (*On Behalf of Plaintiffs & the Nationwide Class*)

241. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

242. The ECPA protects both sending and receipt of communications.

243. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

244. The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

245. Electronic Communications. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website with which

they chose to exchange communications are "transfer[s] of signs, signals, writing, …data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

246. <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

247. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, certain medical conditions, and testing for such conditions. Furthermore, Defendant intercepted the "contents" of Plaintiffs' communications in at least the following forms:

    a. The parties to the communications;

    b. Personally identifying information such as customers' IP addresses, Facebook IDs, unique Google cookies, browser fingerprints, and other unique identifiers;

    c. The precise text of customer communications about specific medical conditions and testing for these medical conditions;

    d. Information that informs third parties of the general subject of communications that Defendant sends back to customers in response to requests for information about specific medical conditions and testing for specific conditions.

248. <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents

… include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

249.   <u>Electronic, Mechanical or Other Device.</u> The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

     a.   Plaintiffs' and Class Members' browsers;

     b.   Plaintiffs' and Class Members' computing devices;

     c.   Defendant's webservers; and

     d.   The Pixel and Google tracking code deployed by Defendant to effectuate the sending and acquisition of customer communications.

250.   By utilizing and embedding the Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

251.   Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Facebook and Google.

252.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, including their sensitive medical conditions.

253.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic

communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

254.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

255.   <u>Unauthorized Purpose.</u> Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution of the laws of the United States or of any State-namely negligence, among others.

256.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

257.   Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

258.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook, Google and likely other third parties to track and intercept Plaintiffs' and Class Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Facebook and Google to eavesdrop on and intercept in real-

time the content of Plaintiffs' and Class Members' private communications with Defendant.

259.  Defendant failed to disclose that it uses the Tracking Tools to track and automatically and simultaneously transmit highly sensitive personal communications to Facebook and/or Google for targeted advertising.

260.  Plaintiffs' and Class Members' information that Defendant disclosed to third parties qualifies as PHI, and Defendant violated Plaintiffs' expectations of and right to privacy, and constitutes tortious conduct. Defendant intentionally used the wire or electronic communications to intercept Plaintiffs' Private Information in violation of the law.

261.  Defendant's conduct violated Plaintiffs' and Class Members right to privacy in that it:  Used and caused to be used cookie identifiers associated with specific customers without customer authorization; and disclosed individually identifiable health information to Facebook and Google without customer authorization.

262.  Defendant's conduct is especially egregious because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing customers and gain new customers.

263.  Defendant's acquisition of customer communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a.  Invasion of Privacy.

264.  Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Private Information on its Website,

because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Facebook and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know was receiving their information, and that Plaintiffs and Class Members did not consent to receive this information

265. As such, Defendant cannot viably claim any exception to ECPA liability.

266. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their medical symptoms, conditions, medical testing sought and concerns) for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

    b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' PII and PHI without providing any value or benefit to Plaintiffs or Class Members;

    c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' PII and PHI, such as understanding how people use its Website, how users purchase Defendant's First Response products, and determining what ads people see on its Website and/or on their social media, without providing any value or benefit to Plaintiffs or Class Members;

    d. Defendant has failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which

included a duty to maintain the confidentiality of its customer information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as medical conditions and testing sought that Plaintiffs and Class Members intended to remain private, no longer private.

267. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels and Google Tracking Tools to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

268. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

269. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

270. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

271. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

272. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each

day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**
**VIOLATIONS OF THE CALIFORNIA**
**INVASION OF PRIVACY ACT**
**Cal. Penal Code §§ 630, *et seq*.**
**(On behalf of Plaintiffs A.D., A.O.S. & the California Subclass)**

273. Plaintiffs A.D. and A.O.S., on behalf of themselves and the California Subclass, repeat the allegations contained in the paragraphs above as if fully set forth herein.

274. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

275. CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

> CAL. PENAL CODE § 630.

> California Penal Code § 631(a) provides, in pertinent part: Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

276. A defendant must show it had the consent of *all* parties to a communication.

---

277.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook, Google and likely other third parties to track and intercept Plaintiffs' and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Facebook and Google to eavesdrop on and intercept in real-time the content of Plaintiffs' and California Subclass Members' private communications with Defendant.

278.   The content of those conversations included highly sensitive PHI. Through Defendant's installation and configuration of the Tracking Tools on the First Response Website, these communications were intercepted by Facebook and Google during the communications and without the knowledge, authorization, or consent of Plaintiffs and California Subclass Members.

279.   Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiffs and California Subclass Members, transmitted the substance of their confidential communications with Defendant to third parties.

280.   Defendant willingly facilitated Facebook's, Google's and likely other third parties' interception and collection of Plaintiffs' and California Subclass Members' private medical information by embedding the Tracking Tools on the Website, thereby assisting Facebook's eavesdropping.

281.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

a.   The computer codes and programs Facebook, Google and other third parties used to track Plaintiffs' and California Subclass Members' communications while they were

navigating the Website;

b.  Plaintiffs' and California Subclass Members' browsers;

c.  Plaintiffs' and California Subclass Members' computing and mobile devices;

d.  Facebook and Google's web and ad servers;

e.  The web and ad servers from which Facebook, Google and other third parties tracked and intercepted Plaintiffs' and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

f.  The computer codes and programs used by Facebook and other third parties to effectuate its tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a browser to visit the Website; and

g.  The plan Facebook, Google and likely other third parties carried out to effectuate their tracking and interception of Plaintiffs' and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

282.   Defendant failed to disclose that it uses the Tracking Tools to track and automatically and simultaneously transmit highly sensitive personal communications to Facebook and/or Google for targeted advertising.

283.   The user communication information that Defendant transmits while using the Facebook Pixel, Google Tracking Tools and other tracking technologies constitutes protected health information.

284. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Facebook, Google and their agents, employees, and contractors to receive First Response customers' online communications in real time through its Website without their consent. Facebook specifically receives the content of these communications and understands it, as the FID is assigned by Facebook and Facebook must understand the content in order to process it and link it to individual Users so that Facebook may target advertising to those persons based on their healthcare choices.

285. By disclosing Plaintiffs' and the California Subclass Members' private health information, Defendant violated Plaintiffs' and California Subclass Members' statutorily protected right to privacy.

286. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant are liable to Plaintiffs and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

287. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

### COUNT III
### COMMON LAW INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On behalf of Plaintiffs A.D., A.O.S. & the Nationwide Class)

288. Plaintiffs repeat the allegations contained in the paragraphs

---

above as if fully set forth herein and bring this count on behalf of themselves and the proposed Class.

289.   Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its First Response Website and the communication platforms and services therein.

290.   Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

291.   Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

292.   Plaintiffs and Class Members had a reasonable expectation of privacy because Defendant's Website states that Defendant is committed to protecting its users' privacy. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

293.   As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

294.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

295.   Plaintiffs and Class Members seek appropriate relief for these

injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiffs' and Class Members' privacy.

296.   Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs & the Nationwide Class)**

297.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themself and the proposed Class.

298.   Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and Class Members conferred a benefit on Defendant in the form of monetary compensation.

299.   Plaintiffs and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

300.   Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

301.   As a result of Defendant's conduct, Plaintiffs and Class Members

suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

302. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

303. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct alleged herein.

## **RELIEF REQUESTED**

304. Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court grant the following relief:

    a.    Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

    b.    A declaratory judgment that Defendant violated: (1) the ECPA; (2) the California Invasion of Privacy Act, and (3) Plaintiffs' and Class Members' privacy rights as provided at common law;

    c.    An order enjoining Defendant from engaging in the unlawful practices and illegal acts described herein; and

    d.    An order awarding Plaintiffs and the Class: (1) actual or statutory damages; (2) punitive damages in an

amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper;  (5) reasonable attorney fees and expenses and costs of suit pursuant to California Code of Civil Procedure § 1021.5 and/or other applicable law; and (6) such other and further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury for all claims asserted herein and so triable.

DATED: September 30, 2024

*/s/ John R. Parker, Jr.*
John R. Parker, Jr.
California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
T: (916) 616-2936
jr@almeidalawgroup.com

**ALMEIDA LAW GROUP LLC**
Matthew Langley*
849 W. Webster Avenue
Chicago, Illinois 60614
T: 312-576-3024
matt@almeidalawgroup.com

David DiSabato*
ddisabato@sirillp.com
Tyler Bean*
tbean@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151

1

T: 929-677-5144

2

*pro hac vice admission anticipated*

3

*Attorneys for Plaintiffs & the Class*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28